Judgment rendered March 4, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,299-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA
IN THE INTEREST OF
H.J.

* * * * *

Appealed from the
Caddo Parish Juvenile Court
Parish of Caddo, Louisiana
Trial Court No. 160,521A

Honorable David N. Matlock, Judge

* * * * *

| | |
|---|---|
| JAMES E. STEWART, SR.<br>District Attorney | Counsel for Appellant,<br>State of Louisiana |
| AUDIE L. JONES<br>TOMMY J. JOHNSON<br>Assistant District Attorneys | |
| INDIGENT DEFENDER BOARD<br>By: Samuel D. Goodwin<br>    Andrew L. Randall, Jr. | Counsel for Appellees,<br>D.J., Mother<br>E.P., Presumed Father |
| CHILD ADVOCACY PROGRAM<br>By: Nancy G. Cooper | Counsel for Appellee,<br>H.J., Child |
| DANIEL T. WILSON | Counsel for Appellee,<br>R.B., Alleged Father |

* * * * *

Before MOORE, PITMAN, and STONE, JJ.

**MOORE, J.**

The State of Louisiana Department of Children and Family Services ("DCFS") appeals a judgment from the Caddo Parish Juvenile Court that denied its petition to find that an infant, H.J., is a child in need of care ("CINC") or that the family is in need of services. After review, we reverse the judgment and remand the case to the juvenile court for further proceedings.

## PROCEDURAL HISTORY

D.J gave birth to a healthy baby, H.J., on July 1, 2019. The following day, DCFS obtained an instanter order based on an affidavit from a social worker familiar with D.J.'s circumstances, and DCFS took custody of the child effective July 1, 2019.

A continued custody hearing was held on July 10, 2019. Based on stipulated facts, the court found that H.J.'s continued custody with DCFS was warranted pending a CINC evidentiary hearing.

On August 6, the court ordered DNA testing to determine paternity and a home study of Natasha Hayes, a relative with whom D.J. said she was currently living.

On September 3, the CINC hearing was held to determine if H.J. was a CINC. After the evidence was adduced, D.J. filed a motion for involuntary dismissal, which the trial court denied. Nevertheless, the trial court declined to adjudicate H.J. a CINC. The court also denied the state's request to stay the ruling pending an appeal.

This appeal followed without a signed written judgment. Following a rule to show cause why the appeal should not be dismissed as premature, DCFS provided the court with a signed judgment dated September 30,

stating "the Trial Court denies to adjudicate the child, [H.J.], as a Child in Need of Care."

Pursuant to this court's order, an amended judgment was signed on October 21, 2019, with the required decretal language that the evidence did not warrant a finding that H.J. is a CINC or that the family is in need of services, and dismissing DCFS's petition.

### FACTS

D.J. has three older children, ages 7, 8, and 11, who are in custody of DCFS and currently in foster care. According to the DCFS child protection investigator who initiated these CINC proceedings, Ashlei Kimble, the state took custody of the three older children on grounds of neglect. D.J. did not have stable housing, she testified, and lived from place to place (e.g. weekly) with different people, including her sister, for short periods.

Jade Montgomery, the foster care worker for D.J.'s three older children, testified at the September 3 CINC adjudication hearing that she became familiar with D.J. after she was assigned to D.J.'s case on March 12, 2019. The three other children were placed in care of certified foster parents who were not relatives of D.J. From March 2019 until H.J was born on July 1, 2019, D.J. had lived at six different addresses. Many of the people with whom D.J. resided had criminal records, according to Ms. Montgomery. For example, D.J.'s sister, Tracy Johnson, with whom D.J. said she was currently living, has a criminal record for prostitution. For this reason, she added, Ms. Johnson would not qualify as a (foster) caregiver for H.J. Ms. Montgomery said that D.J. was going between the residences of Natasha Hayes, her cousin, and Eric Perow, one of two men who could be the

2

biological father of H.J. Perow appeared at the hearing with counsel and testified. The other putative father, Reynard Bailey, did not appear.

Ms. Montgomery believed that D.J. has an intellectual disability and that a psychological evaluation would be appropriate. Regarding D.J.'s difficulty with obtaining stable housing, Ms. Montgomery testified that D.J.'s mother helped D.J. prior to DCFS involvement, but she had passed away in 2016, and since then D.J. has been unable to take care of herself and her children. D.J. receives Social Security benefits, but DCFS has no documents indicating the basis for the benefits. One of the reasons Ms. Montgomery recommended a psychological evaluation was to determine if she could obtain additional Social Security benefits.

Ms. Montgomery said that she visited D.J.'s sister's home in mid-July 2019, about 2 weeks after H.J. was born. She said the apartment was a two-bedroom apartment with no crib or bed for the baby to sleep. She admitted that DCFS could provide a "Pack 'n Play" that may be used for sleeping, but D.J.'s sister would not qualify as a caregiver because of her criminal record. However, Ms. Montgomery did not believe D.J. could properly care for the baby in light of her history with her other three children, whom she said were not fed and sheltered properly.

Ms. Montgomery said that D.J. sometimes stays with Eric Perow, one of the men D.J. named as possibly the father of H.J. The record shows Perow has given a DNA test, but the results were not available at the time of the CINC hearing. Ms. Montgomery's pretrial report to the court indicated Mr. Perow is the father of two other children, Eric, Jr. and D'Eric, who live with him and his mother; D.J. is the mother of these two children. Mr. Perow completed a child welfare abuse/neglect clearance request and was

cleared by the agency and passed a criminal background check. He participated in family visits held monthly. Ms. Montgomery said that Mr. Perow has come forward and expressed his desire to take custody of the child. She said that he must qualify as a caregiver, but that there was no impediment to his approval and there would be no objection from DCFS.

D.J. testified that when H.J. was born, she lived with her sister, Tracy Johnson, at 3553 DeSoto Street in Shreveport. She said that she had clothes, a baby bed, a car seat and a stroller. She said that she intended to purchase some additional things, such as Pampers, because she had just received her Social Security check for approximately $750. She planned to permanently live with her sister, and they intended to move to a larger home.

However, at the time of the CINC hearing, D.J. was living with her cousin, Natasha Hayes, in the Northwood II Apartments on North Market off Grimmett Drive. Natasha has two children of her own also residing there. D.J. said she is attending parenting classes in accordance with her case plan, but has yet to have a psychological examination. She said she likes working with Ms. Montgomery, her case worker.

D.J. said that she received Social Security because she has a crooked back inherited from her father, and also for mental health issues. When asked by the court if she has graduated from high school, she responded, "But I am slow, and I can't read that good." She has never had a job, but was currently looking for work as a cook.

D.J. named the two men who could be H.J.'s father as Reynard Bailey and Eric Perow. D.J. described Bailey as a good father, but not a good guy.[1]

---

[1] The record shows he has a criminal record.

He does not work and receives Social Security. She said Mr. Perow is "a good guy. * * * He ain't no daddy, he's a father. He's a great man."

The court questioned D.J., and asked a hypothetical question: If she had a problem, whom would she would turn to for help? She responded that she would turn to Eric Perow, not her sister, Tracy, or her cousin, Natasha. She also testified that she would like the baby to live with Eric Perow if he is the father.

Eric Perow testified that he is 30 years old. He recently had hernia surgery and now works only part-time for his uncle until he heals from the surgery. He has his own apartment. His mother and his two sons, ages 4 and 2, live in the apartment with him. As previously stated, Ms. Montgomery's report indicated that H.J.'s mother is also the mother of these two boys. Eric's mother, Erica Perow, helps him with the two children. He has no felony convictions and has never been investigated for child abuse.

Both DCFS and H.J.'s child advocate attorney argued that a preponderance of the evidence showed that D.J. was not capable of taking care of H.J. because of her cognitive delays and that she could not support herself or provide stable housing.

Although the record indicates a Court Appointed Special Advocate ("CASA") was appointed, there is no CASA report in the record.

The court asked Mr. Perow if he would be willing to take care of the child pending a paternity determination; Mr. Perow said that he would. However, DCFS and counsel for H.J. objected to such a ruling, arguing that the court must first find that H.J. was a CINC. After such finding, it argued, DCFS could place the child in Mr. Perow's custody.

The court then rendered judgment, stating that it "does not find that the evidence warrants an adjudication in this case." It denied DCFS's request to issue a stay order.

DCFS filed this appeal alleging two assignments of error, namely:

(1)     The trial court manifestly erred by failing to adjudicate H.J. a child in need of care; and,

(2)     The trial court manifestly erred by failing to invoke the principle of accepting the uncontradicted testimony of a witness as true.

## DISCUSSION

Appellate review of CINC rulings are subject to the manifest error standard of review. *In re A.J.F.*, 2000-0948 (La. 6/30/00), 764 So. 2d 47; *State ex rel. L.M.*, (La. App. 2 Cir. 1/26/2011), 57 So. 3d 518. Under manifest error review, an appellate court should not substitute its own opinion in place of the juvenile court who is in the unique position to see and hear the witnesses as they testify. *Id.* Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. *Id.* If the juvenile court's findings are reasonable in light of the record, the appellate court may not reverse, even though convinced had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.*

The state bears the burden of proving by a preponderance of the evidence that the child is a child in need of care. La. Ch. C. art. 665; *State in the Interest of L.B.*, 2008-1539 (La. 7/17/08), 986 So. 2d 62; *State ex rel. L.M., supra.* It is not the duty of DCFS to prove its case beyond a

6

reasonable doubt, by clear and convincing evidence, or to disprove every hypothesis of innocence. *Id.*

In its two assignments of error, DCFS alleges that the trial court committed manifest error when it failed to adjudicate H.J. a child in need of care and manifestly erred when it failed to accept as true the uncontradicted testimony of Ms. Montgomery. It also asserts that the trial court's denial of D.J.'s motion for involuntary dismissal after DCFS presented its testimony was a finding that a preponderance of the evidence supported declaring H.J. a child in need of care.

The purpose of a CINC proceeding is "to protect children whose physical or mental health and welfare is substantially at risk of harm by physical abuse, neglect, or exploitation and who may be further threatened by the conduct of others." La. Ch. C. art. 601. Furthermore, "the health, safety and best interest of the child shall be the paramount concern in all proceedings under [Title VI]." *Id.*

The allegations in a petition that a child is in need of care must assert one or more of several grounds contained in La. Ch. C. art. 606(A). In this case, DCFS alleged:

> (2)     The child is a victim of neglect. Art. 606(A)(2).
>
> (3)     The child is without necessary food, clothing, shelter, medical care, or supervision because of the disappearance or prolonged absence of his parent or when, for any other reason, the child is placed at substantial risk of imminent harm because of the continuing absence of the parent. Art. 606A(3).

However, Art. 606(B) states:

> A child whose parent is unable to provide basic support, supervision, treatment, or service due to inadequate financial

7

resources shall not, for that reason alone, be determined to be a child in need of care.

In this case, DCFS alleged in paragraph 4 of its petition that "there is good cause to believe that [H.J.] is unable to be adequately protected from danger or harm if she remains in the caretaker's custody due to Neglect/Lack of Adequate Shelter and Lack of Adequate Supervision." Additionally, DCFS alleged that D.J. has a history with DCFS, and it currently has custody of her three older children on the same or similar grounds.

"Abuse" and "Neglect" are defined by La. Ch. C. art. 603(2) & (18) for purposes of CINC proceedings:

> (2) "Abuse" means any one of the following acts which seriously endanger the physical, mental, or emotional health and safety of the child:
>
> > (a) The infliction, attempted infliction, or, as a result of inadequate supervision, the allowance of the infliction or attempted infliction of physical or mental injury upon the child by a parent or any other person.
>
> * * *
>
> (18) "Neglect" means the refusal or unreasonable failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child's physical, mental, or emotional health and safety is substantially threatened or impaired.
>
> . . . Consistent with Article 606(B), the inability of a parent or caretaker to provide for a child due to inadequate financial resources shall not, for that reason alone, be considered neglect.

Adjudication of a child in need of care is warranted when a parent shows a repeated pattern of placing a child at risk and exposing a child to a lack of adequate shelter. *State in the Interest of A.R.*, 99–0813 (La. App. 1 Cir. 9/24/99), 754 So. 2d 1073.

8

DCFS argues that because D.J. stipulated to the facts alleged in the affidavit it used to obtain the July 2 instanter order and the July 10 continued custody order, and these facts were essentially uncontradicted by evidence at trial, D.J. has not shown that her circumstances have changed such as there is no longer the need for continued custody by DCFS as a CINC. Nor has D.J. demonstrated, it contends, that she is capable of providing stable housing and the basic needs of the infant on either a short-term or long-term basis. These facts, it maintains, fit the legislatively broad definition of "neglect."

On the contrary, D.J. argues that she did not stipulate that H.J. was a child in need of care at the July 10 continued custody hearing. Rather, she stipulated that, "if called to testify, the DCFS worker would testify in accordance with the affidavit she prepared." The court simply found that there were "reasonable grounds" to believe that H.J. was a child in need of care.

D.J. maintains that the evidence adduced at trial showed that D.J. was living with her sister on DeSoto Street when H.J. was born. D.J. testified that she had clothes, a baby bed, and a stroller for the baby; she had recently received her Social Security check and was going to purchase additional things, including Pampers; and when she needs help she can turn to Eric Perow, who may be the father of H.J.

The DCFS worker, Jade Montgomery, testified that she visited the apartment in mid-July. There were two bedrooms and two beds in the apartment, but there was no crib for the baby. Ms. Montgomery admitted, however, if D.J. were given custody of H.J., DCFS could supply her with a "Pack 'n Play" that can be used as a baby bed.

9

D.J. maintains that the state did not introduce any evidence that H.J. had ever been subjected to any neglect or abuse. Her counsel contends that DCFS's entire argument is "anticipatory neglect" based on D.J.'s prior history.

DCFS argues that the court's denial of D.J.'s motion for involuntary dismissal was a finding by the court that the DCFS established by a preponderance of the evidence that H.J. was a child in need of care, citing C.C.P. art. 1672(B): This article states:

> In an action tried by the court without a jury, after the plaintiff has completed the presentation of evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all evidence.

Our review of the trial transcript indicates that after D.J.'s counsel made the motion for involuntary dismissal, the court said, "That's denied at this stage. * * * Any witnesses?" The ruling complies with the statute, and DCFS's complaint in this regard appears to be baseless.

At the time of trial, D.J. was living with her cousin, Natasha Hayes. She told the trial judge that she wanted H.J. to live with her presumed father, Eric Perow, and stated in her appellate brief that H.J. is currently living with Eric Perow.

During final arguments, the court floated the idea of not adjudicating H.J. a CINC, but placing H.J. in Mr. Perow's custody. It asked Mr. Perow, who expressed his desire to have custody of the child, if he would care for the child until it was determined if he is the biological father of the child

subject to the mother's rights or parent's rights in the event he is not the father. D.J. said she would agree to that arrangement. Mr. Perow said he would and the court indicated that it could leave the *status quo* undisturbed without an adjudication that H.J. is a child in need of care.

DCFS contested this, stating that such an order would be illegal. It argued that H.J. must be adjudicated a CINC before Mr. Perow could be given custody of H.J.

The court ruled from the bench that the evidence did not warrant adjudication.

After review of this record, we conclude that the trial court clearly erred when it declined to adjudicate H.J. a child in need of care. While we are cognizant of the right of people to be left alone and free from undue government intrusion into their lives, this state has a strong, overriding policy to protect children from abuse and neglect by anyone, including their parents. This is particularly true for children who are as young and vulnerable as the infant, H.J., in this case, who is obviously unable to speak for herself.

Because the state obtained custody of H.J. the day she was born and continued custody of her until the September 3, 2019, hearing, there is no evidence that H.J. was subject to neglect or abuse by her mother, D.J. However, this is not a criminal case in which prior unrelated bad acts are generally inadmissible evidence to prove a current criminal act.

In this case, the record shows that D.J. is 29 years old and has given birth to six children including H.J. None of the five older children are in D.J.'s custody. Two of them were apparently fathered by Mr. Perow and are in his custody and care. The state has custody of the three other children due

to incidents of abuse and neglect. The record shows that D.J. is unable to provide stable housing and care for herself and the children without the aid of someone else. Her only income is a $707.00 per month Social Security check. She is unemployed and, apparently, has never had a job.

Experience teaches us that actions in the past are predictive of actions in the future. As noted by DCFS, the evidence presented does not show that D.J.'s circumstances have changed to a significant degree despite her efforts. The risks are far too great to leave this matter to the *status quo* in hopes things may work out for H.J. We therefore reverse the judgment of the juvenile court and determine that H.J. is a child in need of care.

This conclusion is supported by our opinion in the case of *In re B.M.*, 50,977 (La. App. 2 Cir. 9/22/16), 201 So. 3d 974 (on rehearing), *writ denied*, 2016-1916 (La. 10/24/16), 209 So. 3d 94, where this court held that the juvenile court's judgment in which it declined to adjudicate the child, B.M., as a CINC, but at the same time ordering that the child could not return to the parent's travel trailer where they resided until a raw sewage problem was fixed, was an incomplete judgment because the return of B.M. to his parents was conditioned on alleviating the sanitation problem where there was no provision for monitoring that such action was taken. We reversed the judgment of the juvenile court declining to adjudicate B.M. a CINC. We concluded that the evidence of the squalid conditions of the trailer and the fact that the parents were using marijuana and arrested for possession when the state took B.M from the trailer, warranted a finding that B.M. was indeed a CINC. We remanded the case to the juvenile court to continue the proceedings toward disposition.

Similarly, in this case, the juvenile court concluded that the evidence did not warrant adjudication of H.J. as a child in need of care. It appears that the court declined to adjudicate H.J. a CINC based on the belief that Mr. Perow would continue to care for the baby at least until it was determined whether he was the father. There was no plan or order to monitor the results of the DNA testing or to determine what happens in the event that Mr. Perow is not the father. The evidence clearly showed that the mother was not capable of providing a stable, wholesome home environment for the baby.

Additionally, we note that the record does not contain a CASA report. On remand for disposition, the juvenile court will have the benefit of a CASA report.

## CONCLUSION

For the reasons stated above, we conclude that the evidence warrants a finding that H.J. is a child in need of care and render judgment finding H.J. a child in need of care. We remand to the juvenile court for disposition of the case with the benefit of a CASA report.

**JUDGMENT REVERSED; CHILD ADJUDICATED A CHILD IN NEED OF CARE; CASE REMANDED.**